976 So.2d 31 (2008)
The BOARD OF COUNTY COMMISSIONERS OF HIGHLANDS COUNTY, Florida; Carl E. Cool, Sr., as Highlands County Administrator, agency head, and statutory records custodian; Sarah Beth Hopton, as *32 Designated Records Custodian for the Board of County Commissioners; William Nichols, Highlands County Emergency Management Director as actual records custodian, Appellants/Cross-Appellees,
v.
Preston H. COLBY, Appellee/Cross-Appellant.
No. 2D05-5348.
District Court of Appeal of Florida, Second District.
January 25, 2008.
Rehearing Denied March 17, 2008.
J. Ross Macbeth, Sebring, for Appellants/Cross-Appellees.
James F. McCollum of James F. McCollum, P.L., Sebring, for Appellee/Cross-Appellant.
NORTHCUTT, Chief Judge.
In this case, we approve Highlands County's formula for calculating its special service charge for responding to extensive public records requests. We hold that the cost of labor, which is the statutorily prescribed basis for the charge, may include *33 both salary and benefits. Accordingly, the circuit court's ruling to the contrary is reversed. We affirm the final judgment in all other respects, including that portion which approved the County's policy of requiring an advance deposit.
The main legal issue requires our de novo review on a question of statutory construction. See BellSouth Telecomms., Inc. v. Meeks, 863 So.2d 287, 289 (Fla. 2003). For this reason, there are very few facts directly relevant to our decision. Just the same, we find it worthwhile to describe the background to this dispute.
When attending a 2005 hurricane preparedness workshop hosted by Highlands County, Preston Colby learned of a group of local government officials and employees that had met during the 2004 hurricane season. This group, referred to in the workshop as the Hurricane Executive Decision Group, consisted of representatives from several county departments, the three municipalities in Highlands County, the sheriff's office, and the school board.[1] Colby was particularly concerned about whether the group was a collegial body subject to the government-in-the-sunshine laws.[2] In response to Colby's inquiry at the meeting, the County's emergency management director, Bill Nichols, allegedly stated that minutes had been kept but the meetings had not been noticed.[3] In fact, the County had four file boxes of documents relating to the group's activities during the 2004 hurricane season.
Colby asked for documents related to the Hurricane Executive Decision Group, making his request around 11:00 a.m. Colby was no stranger to the public records, and he made his request to the county's public information officer as he had been asked to do previously. In response, Colby received a faxed letter from Tom Portz, an assistant county administrator. Portz's letter set forth the County's understanding that Colby was requesting "copies of all meeting notices, minutes, and notes, including any sign-in sheets, from the executive decision group meetings, which took place in preparation for the 2004 hurricane season." (Emphasis supplied.) Portz explained that Colby's request would require extensive research to locate the responsive documents. He further explained the County's policy of assessing a special service charge when responding to public records requests that required extensive research. Portz calculated that the charge would be $65.12 based on the cost of a designated employee's salary and benefits ($16.28 per hour) multiplied by the estimated time to complete the work (four hours). According to Portz's letter, Colby *34 was required to deposit this sum before the County would begin researching his request.
Colby had two reactions upon reading the assistant county administrator's letter. First, he noted that Portz incorrectly stated that he was seeking copies of the records when, instead, he wanted to examine the documents before deciding what to copy.[4] Second, Colby did not believe that the County was legally allowed to charge for permitting inspection of public records. Although it was around 5:00 or 5:30 p.m., Colby immediately went to the county government center to raise these objections. Portz had already left for the day, so Colby dealt with the public information officer, Sarah Beth Hopton. Colby paid the deposit but complained that the County lacked authority to assess the service charge. Hopton replied that he could sue her if he did not like it. This pretty much ended the conversation, and Colby never communicated to the County that he wanted to inspect the documents rather than receive copies.[5]
The next day Colby did just as the public information officer had suggested: he filed a public records suit against the County, naming in addition Carl E. Cool, Sr. (the county administrator), Hopton, and Nichols. In his verified complaint, Colby alleged that he wanted only to examine the records, that the County failed to make the records available to him, and that the County required him to prepay before locating the records. In his prayer for relief, Colby asked for an order to show cause, an immediate hearing, an order requiring the County to make the records available for inspection and enjoining the County from demanding payment for the inspection of records, the removal from office of the public records custodian, and an award of his suit costs.
That same day, Colby delivered a copy of the complaint to the county attorney's office. At that time, the county attorney gave Colby copies of documents that he said were responsive to Colby's request. Colby accepted the documents, which were 28 pages of handwritten notes; there were no formal minutes, meeting notices, or sign-in sheets from the group's meetings. The county attorney also offered a partial refund because the research took only two hours and forty minutes, which was less than estimated.[6] Colby refused the refund. Finally, the county attorney told Colby that the files were available for his inspection at any time he wished. Colby, however, did not want to look through the boxes of files, and he has never availed himself of this opportunity, although he continues to complain that the County has failed to satisfy his public records request.[7]
*35 As mandated by the public records law, the circuit court held a hearing in short order. See § 119.11, Fla. Stat. (2004) (providing accelerated hearing for action to enforce public records law). Portz and Colby offered the only testimony. In its final judgment, the circuit court ruled that the County was not allowed to include the cost of employee benefits when calculating the labor cost for the special service charge. By implication, the court also ruled that the County was allowed to collect an estimate of the charge in advance. The County appeals the former ruling and Colby cross-appeals the latter. Colby also complains that the County failed to justify the necessity for research to locate the records and to assess the special service charge when Colby wanted only to examine the records.
In Florida, access to public records is a matter of such importance that it is constitutionally guaranteed. Art. I, § 24(a), Fla. Const. Even before this constitutional provision was adopted in 1992, there were statutes providing access to public records. See State v. City of Clearwater, 863 So.2d 149, 152 (Fla.2003) (noting that first public records statute was enacted in 1909). At the same time, Florida has long required those who seek such records to defray the extraordinary costs associated with their requests. At issue today is the scope of the County's authority to charge a fee under Florida law permitting a records custodian to assess a "special service charge" when "the nature or volume of public records requested to be inspected or copied . . . is such as to require extensive use of information technology resources or extensive clerical or supervisory assistance by personnel of the agency involved, or both." § 119.07(4)(d). This charge is in addition to the cost of duplication, which may also be charged to the person requesting the copies. § 119.07(4). The special service charge
shall be reasonable and shall be based on the cost incurred for such extensive use of information technology resources or the labor cost of the personnel providing the service that is actually incurred by the agency or attributable to the agency for the clerical and supervisory assistance required, or both.
§ 119.07(4)(d).
The County has adopted a policy to the same effect as the statute. While chapter 119 does not define "extensive" or "labor cost," the County's policy defines "extensive" as a public records request that "will take more than 15 minutes to locate, review for confidential information, copy and refile the requested material."[8] In such circumstances, the County's policy provides that the charge "will be computed to the nearest quarter of an hour exceeding 15 minutes based on the current rate of pay for the paygrade of the person who performed the service[.]" The County has also adopted a fee schedule that calculates the labor cost by multiplying the research time by the responding employee's hourly wage and benefits. As mentioned, the circuit court held that it was improper to include the employee's benefits in the labor cost calculation.
The purpose of statutory construction is to give effect to the legislature's intent. In attempting to discern legislative intent, we must first look to the actual language used in the statute. BellSouth Telecomms., *36 863 So.2d at 289. Notably, the statute at issue here employs the term "labor cost," the plain meaning of which is more inclusive than the words "wages" or "salary." That benefits may be a significant component of labor costs is widely understood.[9] Thus, as the County points out, in another context the legislature has defined the term "direct labor cost" to mean, in part, an amount not less than "the cost of one employee's salary and benefits." § 526.303(4), Fla. Stat. (2004) (the Motor Fuel Marketing Practices Act). See Overstreet v. State, 629 So.2d 125, 126 (Fla.1993) ("The legislature is assumed to know the meaning of the words in the statute and to have expressed its intent by the use of those words."). In contrast, the County has directed us to various other statutes, in chapters relating to unemployment or worker's compensation, for example, where the legislature has used the terms "wage" or "wages" instead of "labor cost." It has been observed that the use of such differing terms shows that the legislature "well knows how to express itself." Rollins v. Pizzarelli, 761 So.2d 294, 298-99 (Fla.2000) (contrasting language in PIP statute with that in worker's compensation and medical malpractice statutes to support conclusion that legislature intended different meaning when it used the more limited term in PIP statute). Clearly, then, the legislature did not intend that the labor cost component of the special service charge authorized in section 119.07(4)(d) was to be limited to actual wages.
This conclusion is borne out by the statute's history. See City of Clearwater, 863 So.2d 149 (reviewing amendments to statute, in addition to plain language, to support interpretation). Historically, a records custodian has been allowed to assess specific charges. For example, when it was impossible or impracticable to photograph records in the place where they were kept, a person seeking to photograph records was required to cover the expense of providing a suitable place. § 119.03, Fla. Stat. (1941) (now located at section 119.07(3)(d), Florida Statutes (2004)). The records custodian was also allowed to charge for the services of the custodian or a deputy who supervised the photographing of public records "at a rate of compensation to be agreed upon by the person desiring to make the said photographs and the custodian . . ., or in case the same fail to agree as to the said charge, then by the board of county commissioners of said county." § 119.03, Fla. Stat. (1941).
In 1975, the legislature amended the public records law to allow for the collection of fees when copies were requested. Ch. 75-225, § 4, at 638, Laws of Fla. (amending section 119.07(1) to state that a records custodian shall furnish copies "upon payment of fees as prescribed by law or, if fees are not prescribed by law, upon payment of the actual cost of duplication of the copies"). The legislature added a version of the provision at issue here in 1979, when it created section 119.07(4) to provide as follows:
In the case of records produced under this act, when the nature or volume of records is such as to require extensive clerical or supervisory assistance by personnel of the agency involved, the agency may charge, in addition to the actual cost of duplication, a reasonable charge, approved by the Department of Administration, *37 for the provision of such clerical or supervisory personnel.
Ch. 79-187, § 4, at 726, Laws of Fla. Later, the legislature eliminated the Department of Administration's role in setting these charges and instead directed that the charge "shall be based on the actual salary rate of such personnel providing the service." Ch. 81-245, § 1, at 989, Laws of Fla. In 1984, this language was replaced in part with language that continues in substance to this day, permitting the agency to collect "a special service charge, which shall be reasonable and shall be based on the labor costs actually incurred by the agency or attributable to the agency for the clerical and supervisory assistance required of such personnel providing the service." Ch. 84-298, § 5, at 1401, Laws of Fla. (emphasis and stricken language omitted).
The statute's evolution  authorizing charges that were agreed upon or set by a county commission, then set by the Department of Administration, then based on salary rate, and currently based on labor cost  supports our conclusion that the legislature intended more than salary by its use of the term "labor cost." See State v. Parks, 866 So.2d 172, 174 (Fla. 2d DCA 2004) (stating presumption that legislature intends statute to have different meaning when it amends language of statute).
Therefore, we reverse the circuit court's interpretation of section 119.07(4)(d), and we approve the County's formula that includes both an employee's salary and his or her benefits when calculating the labor cost to be included in the special service charge authorized by that statute.
With a brief discussion, we affirm the issues raised by Colby on cross-appeal. First, the County presented sufficient testimony at the show cause hearing to substantiate the basis for the charge. Second, the special service charge applies to requests for both inspection and copies of public records when extensive clerical assistance is required. See 119.07(4)(d) ("If the nature of volume of public records requested to be inspected or copied. . . .) (emphasis supplied). And third, the County may collect a deposit before beginning the research, as long as it is reasonable and based on the labor cost that is actually incurred by or attributable to the County.
On this last point, the County's policy of requiring an advance deposit seems prudent given the legislature's determination that taxpayers should not shoulder the entire expense of responding to an extensive request for public records. And we note that the facts in this case do not suggest an abuse by the County. Even though the County performed the research task faster than anticipated, it explained the difference based on the director's personal familiarity with the records. Furthermore, the County made no attempt to increase the charge based on his higher compensation. Given the statutory requirement that the charge be reasonable and based on actual costs, we are confident that any abuse in future cases can be redressed through the courts. See, e.g., Carden v. Chief of Police, City of Clewiston Police Dep't, 696 So.2d 772 (Fla. 2d DCA 1996) (reversing and remanding for police chief to explain in detail special service charge of $4000 for public records request in light of statute's requirement that charge be reasonable).
Reversed in part, affirmed in part, and remanded.
SALCINES and CANADY, JJ., Concur.
NOTES
[1] In a workshop handout, the County described the group as one that

usually meets 3-5 days prior to storm arrival and participates in conference calls with the State. Storm progress is monitored, and as it becomes a threat, decisions are made concerning implementation of preparedness activity in the county. As the date of storm arrival nears, additional personnel are brought into the group as necessary to ensure that appropriate actions are taken.
[2] See § 286.011, Fla. Stat. (2004) (requiring notice and recorded minutes for meetings of public bodies). Although pertinent to an understanding of the facts, Colby's motivation is not legally relevant. See Warden v. Bennett, 340 So.2d 977, 978 (Fla. 2d DCA 1976) (stating that the public records law "does not direct itself to the motivation of the person who seeks the records").
[3] These comments were attributed to Nichols in a document Colby introduced at the hearing below over the County's objection. Colby claimed that the document consisted of minutes from the 2005 hurricane preparedness workshop. But, in support of a motion for rehearing, the County filed an affidavit by Nichols stating that he had never seen any minutes from this group's meetings.
[4] Colby described this as his general modus operandi for public records requests.
[5] Again, this fact has little relevance because, as we will explain, the special service charge applies to requests for both inspection and copies. But this exchange exemplifies the parties' general inability to communicate with each other in an effective or constructive way, an unfortunate state of affairs that has continued throughout this litigation.
[6] The County estimated four hours by Nichols' assistant. When she was not immediately available to do this work, Nichols himself performed it. Given his more direct familiarity with the files, he was able to complete the project in less than the projected time. Nichols' salary was higher than his assistant's, but the County did not increase the service charge that had been quoted to Colby.
[7] Specifically, Colby wanted formal minutes, which Nichols allegedly said had been kept. In proceedings conducted after the circuit court's ruling, and in multiple motions and responses filed in this court after oral argument, Colby persists in his demand for the County to produce these seemingly nonexistent minutes.
[8] The County derived this definition from Florida Institutional Legal Services, Inc. v. Florida Department of Corrections, 579 So.2d 267 (Fla. 1st DCA 1991) (2-1 decision approving administrative rule measuring extensive assistance based on fifteen minutes). Because Colby's request required substantially more than fifteen minutes to research, we find it unnecessary to comment on this portion of the County's policy.
[9] Employment benefits may account for as much as twenty to forty percent of labor costs. Eileen Silverstein & Peter Goselin, Intentionally Impermanent Employment and the Paradox of Productivity, 26 Stetson L. Rev. 1, 9 (1996) (discussing change from full-time, permanent employees to part-time and temporary workers and independent contractors). In Highlands County, benefits account for approximately thirty percent of its labor cost.