IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

CASE NO. 1D13-5721

MORRIS PUBLISHING GROUP, LLC, d/b/a, THE FLORIDA TIMES-UNION MULTIMEDIA HOLDINGS CORPORATION and GANNETT RIVER STATES PUBLISHING CORPORATION, d/b/a, WTLV/WJXX FIRST COAST NEWS, and POST-NEWSWEEK STATIONS FLORIDA, INC., d/b/a, WJXT-TV4,

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF IF FILED.

Petitioners,

v.

STATE OF FLORIDA AND MICHAEL D. DUNN,

Respondents.

_____/

Opinion filed January 20, 2015.

Petition for Writ of Certiorari - - Original Jurisdiction.

George D. Gabel, Jr., Timothy J. Conner, Jennifer A. Mansfield, and Paul R. Regensdorf of Holland & Knight, LLP, Jacksonville; Meagan L. Logan and Edward L. Birk of Marks Gray, P.A., Jacksonville, for Petitioners.

Pamela Jo Bondi, Attorney General; Samuel B. Steinberg, Jay Kubica, and Trisha Meggs Pate, Assistant Attorneys General, Tallahassee; Cory C. Strolla, West Palm Beach; Angela B. Corey, State Attorney, and Meredith Charbula, Assistant State Attorney, Jacksonville, for Respondents.

PER CURIAM.

Criminal discovery and Florida public records laws are at issue in this case. Morris Publishing Group, LLC, Multimedia Holdings Corporation, and Gannett River States Publishing Corporation (collectively the "Media"), seek review of the trial court's order, which concluded that the State Attorney's Office, Fourth Judicial Circuit (SAO), did not act unlawfully in delaying or withholding recorded phone conversations of a criminal defendant, Michael Dunn, without first securing a deposit from the Media to cover the costs of reviewing the recordings to redact information that is exempt/confidential under Chapter 119, Florida Statutes. Due to the unusual facts of this case and the novel legal issue presented, we deny the petition but certify a question of great public importance as detailed below.

I.
A.

This overly contentious public records litigation is back for a fourth round of appellate review, this time limited solely to the Media's access to recorded phone conversations in which Mr. Dunn engaged while incarcerated and awaiting his first criminal trial held in Jacksonville, Florida. The case garnered much attention in the local, state, and national media. In September 2013, the Media made its initial public records request for criminal discovery records, which makes such items subject to inspection and copying. See § 119.011(3)(c)(5), Fla. Stat. (addressing documents in criminal discovery that are part of public records).

Interest in the criminal discovery spiked around October 16, 2013, when the SAO released various records including letters written by Mr. Dunn, a police interrogation video, witness statements, 9-1-1 audio recordings, and crime scene photos. Many of Mr. Dunn's letters were immediately aired, some of which included potentially inflammatory racial references to fellow inmates where Mr. Dunn was jailed. Heightened interest thereby arose among the Media and the public over the hundreds of recorded phone conversations to which Mr. Dunn was a party while incarcerated and awaiting trial.

Access to all criminal discovery, however, came to a halt soon thereafter. On October 24, 2013, after reading media accounts of the jailhouse letters, the trial judge entered an order on his own initiative without notice to the Media that barred public dissemination of any criminal discovery in the case without his approval. The "sole purpose" of the order was to provide the trial judge an opportunity for "in-camera inspection to ensure that no exempted materials become inadvertently disclosed to the public, and to ensure that Defendant's constitutional right to a fair trial is not jeopardized."

After a series of emergency petitions and orders of this Court, over a span of three months, the trial court's restrictive orders were lifted. We summarized that the effect of our orders "was to require immediate release of all such public records" absent an immediate evidentiary hearing and "written order for possible

3

appellate review." We deemed it necessary to compel "disclosure of all criminal discovery produced in this case, *including but not limited to the defendant's recorded conversations*, provided pursuant to Florida Rule of Criminal Procedure 3.220." (Emphasis added). We noted, however, that our order did "not modify [the Media's] requirement to comply with necessary payment and other administrative requirements provided in Chapter 119." The trial court promptly held a hearing at which Mr. Dunn's counsel made a generalized, but unsupported objection to disclosure of the public records. Because no showing was made that the release of the criminal discovery posed any meaningful risk to Mr. Dunn in the prosecution of the ongoing criminal proceedings, the trial court denied Mr. Dunn's request to keep the discovery confidential, thereby compelling the immediate release of all public records at issue, including the recorded conversations, subject to whatever "necessary payment" requirements Chapter 119 imposed.

As to the phone recordings, the SAO required advance payment from the Media for its anticipated efforts to complete its public records review process. It estimated that the cost of reviewing and redacting the recorded jail calls for confidential and exempt information would be over $6,000, and approximately half that amount was required as a deposit to begin the review process. The Media refused to pay the deposit, contending that the SAO's policy of requiring full payment to review every phone recording including those the SAO had already

reviewed for trial purposes, violated Florida's public records laws. The Media sought an emergency hearing to determine whether the SAO was violating Chapter 119, and obtained an order of this Court to expedite the matter. Because the first day of trial—set for February 3, 2014—was just a few days away, we permitted the circuit's chief judge to consider the appointment of a special master or magistrate to hold a hearing and make recommendations to the trial court. As jury selection began, the chief judge did just that, appointing a magistrate to determine whether the SAO's response to the Media's requests for the recorded jail calls was reasonable or amounted to an unlawful refusal of access.

B.

The testimony before the magistrate established that there are two ways the SAO reviews recordings of jail calls. For its trial review process, a non-attorney support specialist listens to jail calls while performing other tasks, essentially keeping an ear out for any potentially relevant or helpful information to the prosecution's case. The specialist maintains a summary of the calls for purposes of this review. In contrast to this type of review, public records review is handled differently. The SAO maintains a two-person public records unit, comprised of one attorney and one administrative assistant.  Upon receipt of a public records request for criminal discovery involving audio recordings, the administrative assistant first listens to the recordings in their entirety, stopping to redact exempt material. The

5

redaction process consists of stopping and rewinding the recording, creating a marker showing where the exempt material is contained, and removing the audio from that portion of the recording. Once that process is completed, the attorney conducts an abbreviated review of the recordings, checking the redactions and listening to the recordings at double their normal speed for items the assistant may have missed.

To estimate the cost of its review, the SAO multiplied the hours of calls by 1.5 for the administrative assistant's initial, lengthier review, and then by the administrative assistant's hourly rate of pay, which in this case is $10.94. The SAO then multiplied the hours of calls by 0.5 for the attorney's double-speed review, and then multiplied that number by the attorney's hourly rate of pay, which in this case is $35.61. For the 186 hours of calls at issue, the SAO estimated that the public records review would cost $6,357.14, and it required a $3,000 deposit before it would begin its review. If the actual cost of producing the redacted records is lower than the estimate, a refund would be issued; the Media was notified of this refund policy. The SAO would also split payment among multiple requesters. Though the Media could choose calls from a list the SAO prepared, only the time and date of each call was listed.

Following the evidentiary hearing, the magistrate entered a report and recommendation, concluding that the SAO's failure to produce the calls without

6

the requested financial deposit was not an unlawful refusal of access. The magistrate, however, recommended that the SAO immediately release eight hours of jail calls by 5:00 p.m. on each business day, and that the Media pay a rolling deposit of $273.60 at the end of each business day or $1,374.50 for each 40-hour workweek of labor. With 186 hours of calls to be reviewed, and an estimated 360 hours to review them, the entire process would require nine weeks to be completed.

On March 12, 2014, the trial judge adopted the magistrate's report and recommendations, except that he ordered only six (rather than eight) hours of calls to be produced each work day. Three days later, a jury verdict was rendered.

## II.
### A.

With this background in mind, we turn to the central issue in this case: whether the SAO's actions in withholding the phone recordings and requiring advance payment before starting its review of the requested phone recordings constitutes an unlawful delay or denial of access to these public records. No one disputes that the phone recordings are public records or that they must be made available in as immediate a manner as is practicable. And, as a general matter, the Media does not disagree that advance payment of some amount may be required. Instead, the crux of the legal issue is to what extent, if any, was the SAO as a records custodian legally required to coordinate its review of phone recordings for

7

discovery purposes and for use at trial, with its public records request review under Chapter 119. We find no clear answer.

"In Florida, access to public records is a matter of such importance that it is constitutionally guaranteed." Bd. of Cnty. Comm'rs of Highlands Cnty. v. Colby, 976 So. 2d 31, 35 (Fla. 2d DCA 2008) (citing art. I, § 24(a), Fla. Const.). Chapter 119 obligates a state agency to provide public records to any person requesting them. See § 119.01(1), Fla. Stat. (2013) ("It is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person. Providing access to public records is a duty of each agency."). As a policy, this chapter acknowledges that public records have become "automated" in the modern era, but that the "[a]utomation of public records must not erode the right of access to those records." See § 119.01(2)(a). "As each agency increases its use of and dependence on electronic recordkeeping, each agency must provide reasonable public access to records electronically maintained and must ensure that exempt or confidential records are not disclosed except as otherwise permitted by law." Id. Based on these dual policies, the SAO's burden to provide reasonable access to the public records at issue is tempered by its obligation to ensure that no exempt or confidential information is disclosed.

Custodians of public records are required to make them available for inspection and copying at reasonable times under reasonable conditions.

8

§ 119.07(1)(a). Requests must be acknowledged promptly and responded to in good faith. § 119.07(1)(c). A custodian has a duty to redact portions of public records that are exempt, stating the basis "in writing and with particularity the reasons for the conclusion that the record is exempt or confidential." § 119.07(1)(d)-(f). A custodian may impose a statutorily-regulated fee for the cost of copies. § 119.07(4). If no set fee is prescribed by law, custodians are allowed to impose other statutorily-defined fees. For instance, a "special service charge" is available in certain circumstances:

> (d) If the nature or volume of public records requested to be inspected or copied pursuant to this subsection is such as to require extensive use of information technology resources or extensive clerical or supervisory assistance by personnel of the agency involved, or both, the agency may charge, in addition to the actual cost of duplication, a special service charge, which shall be reasonable and shall be based on the cost incurred for such extensive use of information technology resources or the labor cost of the personnel providing the service that is actually incurred by the agency or attributable to the agency for the clerical and supervisory assistance required, or both.

§ 119.07(4)(d); see, e.g., Colby, 976 So. 2d at 37 (upholding special service charges for work that required more than approximately fifteen minutes to locate, review, and refile requested records).

An unlawful denial of access can occur in many different ways, including delay. See, e.g., Tribune Co. v. Cannella, 458 So. 2d 1075, 1079 (Fla. 1984) ("The only delay permitted by the Act is the limited reasonable time allowed the

9

custodian to retrieve the record and delete those portions of the record the custodian asserts are exempt."); see also Barfield v. Town of Eatonville, 675 So. 2d 223 (Fla. 5th DCA 1996) ("An unjustified delay in complying with a public record request amounts to an unlawful refusal under section 119.12(1), Florida Statutes."). It may also occur by excessive special services charges. See, e.g., Carden v. Chief of Police, City of Clewiston Police Dep't, 696 So. 2d 772, 773 (Fla. 2d DCA 1996) ("An excessive charge could well serve to inhibit the pursuit of rights conferred by the Public Records Act.").

B.

The narrow focus of the challenge before us is whether the *application* of the SAO's public records review policy to the facts of this case amounts to an unlawful delay and denial of access. This Court recognized this theory in Johnson v. Jarvis, 74 So. 3d 168, 171 (Fla. 1st DCA 2011), where we said that the "reasonableness of the appellee's policy itself is not the subject of the inquiry. Rather, the inquiry centers on whether the application of the policy resulted in an unjustified delay that amounted to an unlawful refusal to comply with chapter 119." The focal point in Jarvis was whether a facially reasonable policy might nonetheless result in an unreasonable delay of access based on the policy's application to a particular set of facts. Id. at 170-71 (remanding to "determine

10

whether there was a delay to produce the requested records and, if so, whether the delay was reasonable under the facts of this case.").

Here, the Media's primary point is that the SAO's public records review policy is combative, inefficient, unduly expensive, and prolonged, which made it virtually impossible to get access to Mr. Dunn's phone recordings prior to trial. They further contend that the SAO overstated its estimated special service charges and increased delays by failing to disclose summaries of the phone calls and failing to take any steps to coordinate or combine its ongoing review of Mr. Dunn's phone recordings. The Media points out the antipathy between it and the SAO, which the magistrate observed was "palpable," along with the SAO's public statements criticizing the public records laws. All of this, according to the Media, reflected an intent to make the process of getting the requested public records as onerous as possible for them.

The SAO counters that it has two independent review processes, both facially reasonable, and that the Media requests for the phone recordings vacillated,[1] making it unclear whether they desired the calls and would pay the deposit. Further, due to the extensive review needed to complete the calls—360

---

[1] This vacillation appears to have occurred during the time when the trial court's restrictive orders were in place, making it confusing what (and when) criminal discovery would be made available to the public and Media.

11

hours—requiring a deposit was not unlawful. The SAO also notes that the Media does not claim the magistrate's findings lack competent substantial evidence as to the SAO's estimated costs and methodology and the estimated time for review and production.

We first note that the SAO's policy of requiring the payment of a deposit prior to redaction and delivery of public records is facially reasonable. Colby, 976 So. 2d at 37 ("[T]he County's policy of requiring an advance deposit seems prudent given the legislature's determination that taxpayers should not shoulder the entire expense of responding to an extensive request for public records."). Noting that "the facts in this case do not suggest an abuse" by the custodian, the Second District emphasized that the County reviewed the records faster than estimated and at a cost lower than it could have charged. Id. Thus, the reasonableness of a policy and its application—based on the facts in a particular case—guides whether an abuse of discretion is shown. As a counter-point, the Media cites to Office of the State Attorney for the Thirteenth Judicial Circuit of Florida v. Gonzalez, 953 So. 2d 759, 765 (Fla. 2d DCA 2007), which upheld the trial court's conclusion that "requiring payment before an invoice cannot excuse the delay in providing [public] records." Though Gonzalez is distinguishable because it involved only photocopying costs, rather than "special service charges" as is the case here, we

agree with the larger point, which is that the factual context of how much advance deposit must be paid for special service charges can be abused.

We next turn to the claim that the SAO should have attempted to consolidate its evidentiary review for trial with its public records review process. The magistrate, and by implication the trial judge, rejected the position that it could compare the SAO's two policies with the hybrid one proposed by the Media, concluding that the only inquiry permitted by law was whether the SAO's policies were themselves reasonable. Nonetheless, the magistrate agreed that the type of cooperative policy suggested by the Media was something that the SAO should consider, saying:

> I agree with you, it is something that should be looked at and perhaps the policy may be changed. But unfortunately that's not my power, and not the ability that I have to do anything about . . . so probably it might have been a brighter idea at that time to contemporaneously, while they searched it for evidence to also search it for exemptions, so that they would have it available to produce. But that's not the case, and that's not the law. Just because they could have, doesn't mean that they were required to.

Thus, the legal focus of the magistrate's analysis was solely on whether the SAO's policies independently were facially reasonable, not whether their application to the Media's requests—in the factual context of a palpably hostile relationship between the SAO and the Media—was unreasonable. Given this limited focus, the evidence

13

taken at the hearing established that the evidentiary review and the public records review by the SAO are two different tasks, both facially reasonable.

While we agree as to the facial validity of the SAO's individual policies, we recognize that otherwise facially valid policies can be implemented in such a way as to result in unjustified delays or costs that lack good faith. See Jarvis, 74 So. 3d at 170-71. But to reverse the trial court's adoption of the magistrate's order, we would have to conclude that the SAO had a *legal* duty while conducting its review of criminal discovery for use at trial to adapt or modify that process to combine it with its public records review process. To our knowledge, no case has addressed this legal question.

Valid arguments exist either way. In some situations, a state attorney's office may be able to combine its criminal discovery efforts to facilitate its public records review process, and thereby reduce costs and lessen delay to the requesting parties. Indeed, in response to the Media's assertion that the SAO's public records policy was duplicative and unreasonable, the magistrate agreed to some extent, saying "[t]hat point is well taken, that part of it seems to be unreasonable." Contrarily, the imposition of a legal duty, versus a hortatory one, could have unintended and costly consequences by imposing administrative burdens on agencies that do not have the resources or personnel to conduct the two review functions simultaneously. Here, the SAO apparently conducted both processes as to the criminal discovery it

14

initially disclosed, but disclosure of that batch of public records did not include review of phone recordings, which are the focus of this case. Other policy arguments from both perspectives undoubtedly exist.

All that said, the ultimate question here is whether the application of the SAO's public records policy is unreasonable because it failed to take steps to avoid repetition and duplication with its review of the recordings for use at trial. Coordinating trial review efforts with pending public records requests (and perhaps even anticipated requests in the highest profile cases) makes sense, but in the absence of clear legislative intent requiring it, we are unable to conclude that the SAO is legally required to do so.[2]

In conclusion, because we find no legal duty exists to require a custodian of criminal discovery to combine its ongoing discovery review for trial with public records requests, we deny the Media's request for relief, but certify the following question of great public importance:

> DOES A CUSTODIAN OF CRIMINAL DISCOVERY HAVE A LEGAL OBLIGATION TO, WHERE POSSIBLE, COMBINE ITS REVIEW OF DISCOVERY FOR TRIAL PURPOSES WITH A

---

[2] The Media also argues that the SAO should have used the prosecution support specialist's call summaries to shorten the redaction process or to enable them to identify which calls the Media might request. The availability of those summaries, possibly redacted of any notations that might reveal trial strategy, would be of immense assistance to persons who might be put in the position of trying to determine which of 186 phone recordings they might want.

PUBLIC RECORDS REQUEST IF DOING SO WILL BE ECONOMICALLY EFFICIENT AND RESULT IN LESS DELAY?

PETITION DENIED.

THOMAS, RAY, and MAKAR, JJ., CONCUR.